The next case for argument is United States v. Haro. I am here. Your Honor, for some reason my video is not starting. Okay, which one of you is Mr. Cortez? Speaking right now. Here I am. Okay, there you are. So you're Mr. Cortez. Yes. And Mr. Hawley is the opposing counsel, right? Yes. Very well. All right, Mr. Cortez, please proceed. Thank you. May it please the Court, Ezequiel Cortez for Mr. Haro. I'm going to reserve, if I may, two minutes for rebuttal. And what I will do is, because I know that the Court has already reviewed the briefing carefully and closely, I'm going to focus in on what I believe are highlights for Issue No. 1, the Terry Stop Issue, and Issue No. 3, the Material Witness Deposition Testimony. And for Issue 1, if you don't mind, Judge Smith, I'm going to borrow a phrase that you used in prior case. I like those cases. For me, this case is like the Twilight Zone. Before I heard you this morning use that analogy, I thought about Schrodinger's cat and the cat being dead and alive in the quantum world. People thought it was an irrational circumstance to have a cat simultaneously dead and alive. Why is that relevant to this case? Because in this case, you have facts that pretty much are undisputed. Those facts for the Terry Stop are Officer Davis, Border Patrol Officer Davis, he testified that on the freeway, he caught up to the Ford Fiesta. He went parallel to the Ford Fiesta, peeking inside the Ford Fiesta. And all the way up to that point, he did not feel he had enough, found it suspicious to pull anyone over. And that's logical because he would have pulled them over if he did. In other words, everything that Officer Clinton had relayed to him before in the BOLO, the Be On The Lookout warning, was not enough in Officer Davis's mind nor the collective knowledge of the officers to pull Mr. R over. Let me ask you this because I want to be sure I'm understanding your position. Yes, sir. Are you saying that we can't combine the collective knowledge of the two officers? Irrationally for the defense. In determining whether there was reasonable suspicion. Is that your position? Sorry, I keep interrupting. Sorry. That's okay. Go ahead. No, no, no. In fact, uncharacteristically of the defense, I'm usually arguing individual facts. Here, as our briefs noted, we're asking the court to look at the totality of the circumstances. To use the rational inferences, much like you did in the prior case. And to use precisely all observations up to the point where Mr. Harder was pulled over. Why are we asking you to do that? Because even Officer Clinton, the prior officer who made those observations. And that motivated him to put out the bolo. He admitted across examination very candidly. I didn't have enough to stop him. He wasn't violating the law. He wasn't doing anything wrong. And so, if you take the collective knowledge of the officers, which you have to, under Cortez and Arvizu. Then what you have is no founded suspicion at all. Leading up to when the fourth fiesta went by Border Patrol Officer Davis' position on the freeway. He then testifies. He gets on the freeway. Goes after the fourth fiesta. Catches up to him. And as I was saying, parallels him. Why am I saying this is the twilight zone? Or Schrodinger's dead and alive cat simultaneously? Because the government has the burden under Delaware v. Sprouse to prove that you have rational. Rational is the word. Rational inferences. Articulable suspicions. Based in reason and common sense. The government's other witness in this issue is the mature witness. They adopted the transcript of the deposition hearing for the motion hearing. For the suppression hearing. And for trial, as you know. Well, the mature witness, having every motive in the world to hide from the authorities. He testified very clearly at the deposition right in front of the assistant U.S. attorney. And he said, no, I never saw any Border Patrol unit anywhere. I don't care how big it was. I first noticed it when the driver told me, oh, my God. And then I looked back. I looked back and I saw the patrol approaching us. Approaching us with the lights on. Those are the facts the government has in its case. Those are not our facts. We don't have a burden. This is a warrantless seizure on the freeway in a robbing type situation. Let me, let me, let me, following the dead cat, dead and alive cat analogy. You know, before the crossing, Officer Clinton knew that Hara was a known alien smuggler. I don't think you're disputing that. We're not. You do or you don't. No, we do agree. He was. Okay. So he, he knew that. He, he saw him taking a number of actions on the other side of the border that he thought were suspicious. And he, you know, did a number of things here that seemed to alert him about this vehicle and about Hara. With that in mind, we're coming from somebody who's a known alien smuggler. He has a vehicle in mind. And there's no reason why you can't follow, see what's going on. And when he saw him, he banged the steering wheel in frustration, apparently. At least that's the way the officer took it. Isn't that right? Those are two different timeframes. Can you tell me about that? The facts that you were mentioning from Officer Clinton by the border in Calexico two months earlier. Right. Completely different from the day of the arrest. I understand that. I realize it's a different time framework, but it's the same guy and it's the same car, right? Yes, sir. Yes, sir. Okay. So you got that. The other officer is alerted that this has been a crossover. He then follows him. And he observes that when the driver, Mr. Haro, sees him, he bangs the wheel, steering wheel, in frustration. As the officer viewed it. Now, given what was told to him before, why does that not constitute reasonable suspicion? Since the other guy was kind of down and he had seen him kind of down before. Why didn't that give him reasonable suspicion to stop the vehicle and see what was happening? Your question illustrates my presentation. Thank you for it. And that's why I used the Twilight Zone analogy. Let me explain. Okay. Officer Clinton, senior officer, undercover officer in Calexico, downtown Calexico. He knows Mr. Haro is a documented person. He knows he's on supervised release for the same thing. All those facts are admitted. And those very facts, those very observations, Judge Smith, by a senior officer of the Border Patrol on cross-examination. That's why I asked him. On cross-examination, did you see him do anything suspicious? No. Did you see him violating any law? No, I didn't. Why didn't he stop him? Counsel, is your argument really that the Bolo was invalid? Because if it wasn't, what does that do with your position on the stop? We are submitting that the Bolo was improper. That is not sufficient. So the officer who actually conducts the stop and reacts to the Bolo, wouldn't there be some sort of a good faith exception? Because how is he supposed to know that the Bolo is invalid? Another excellent question. So if he's acting in good faith, that's why at the beginning I noted that Officer Davis did not pull over Mr. Haro immediately upon seeing the vehicle. He had to pull up, according to him, he had to pull up next to the vehicle, and you know the rest of the story. Only after making those particular observations, and I have his transcript here, he specifically said, then after seeing suspicious activities, I pulled behind it and then activated the emergency lights. So if you take Officer Clinton's separate date, separate time, like in the Twilight Zone, and the Bolo, and even if the Bolo gives Officer Davis good faith basis, he's telling you he didn't have enough to pull over the car. That's what he's saying. I don't know that I can say that that's what he's saying. That he didn't immediately pull over the car, he's still making observations. There could be multiple reasons. So here's where I see the record. You have the Bolo that says, here's this car. It's engaged in suspected alien smuggling. Here's the person we think is going to be driving it. He sees that car. He sees a driver that looks like that person that's identified in the Bolo. He sees this half an hour after a border patrol station closes. He sees another person in the car that meets the description, I suspect, of an alien that might be getting smuggled from Mexico. And he makes a stop. How is that not reasonable suspicion? Certainly not probable cause. How is that not reasonable suspicion? Correct. Your Honor, in our briefs we laid it out, we thought very logically. We are not conceding that Officer Davis made all those observations. And that's why I'm asking you to look at the totality of the circumstances, including the Bolo. If you look at the totality of the circumstances, which you are required to do, you're going to see that there was no prior suspicious activity of any type. Then Officer Davis testifies the way he did. And then you have the mature witness testimony that directly contradicts Officer Davis about where he was positioned on the freeway when he claimed he made those observations. So we're not conceding at all, Your Honor. And we laid it out in our briefs that Davis' statements are true. In fact, the government had a burden to, when Officer Davis testifies at the suppression hearing, to ask him a bunch of other questions. They didn't clean it up. At the deposition, Your Honor, when they had the mature witness, well, wait a minute, sir. You said the first time you saw the Border Patrol unit was coming up behind you? Yeah. Isn't that a fact then? And then they would have cleaned it up. You have to look at the totality of the government's record, which is their burden in a founded suspicion standard, and not pick and choose which facts. But again, I get back to what we started with. You've got two parts to this. You've got the Calexico part. You've got the United States part. And those two are part and parcel of the same issue. My colleague had just reiterated what they knew. This does not seem to be a difficult issue to me. What am I missing? Here, let me suggest the following. A founded suspicion calculus, and the law is very clear, both sides cited the same authority, requires officers to have rational, articulable, founded suspicion that a crime is going on or is about to be committed. All of the observations in Calexico, Judge Smith, that's why I had to, again, I had to ask the officer. He's a senior officer. Well, you didn't think he was doing anything wrong, right? Correct. So when you get all of that out of the way, that there was no actual rational suspicion, then what you have is no suspicion at all. So you cannot add those to the calculus because you didn't know. With respect, I do not agree with you. I can see that. It is true that in Calexico he did not observe a crime, but he had, as you admitted, a guy who was, you know, unsupervised release for doing the very thing we're talking about. He took a number of actions that seemed like they were preparatory to doing it again. He didn't have anything to arrest him for. But then he reported to, I guess, Officer Davis what he had observed. And it matched all of the criteria. And that has to be factored into what Davis saw when he followed the vehicle, does it not? In a way. But remember, Judge Smith, all those observations, which are the totality of the circumstance, occurred a month earlier. And they were not in the Bolo. They were not in the Bolo for Officer Davis, sir. All that was in the Bolo was a Ford Fiesta with the license plates, with a Hispanic heavyset gang member. Be careful. That's all that was in there. So when you attribute the totality of the circumstances to Davis, you also have to attribute that there was no criminal conduct afoot before. And so the only thing. Go ahead. I'm sorry. I want to save time. It's up to you. Yes, sir. Thank you. Thank you. I just wanted to know. Okay. All right. I bet the government disagrees with that. I bet they do. Okay. Let's hear from the government. We do, Your Honor. May it please the Court, Benjamin Hawley for the United States. So I think the primary flaw in the defense's argument, as I understand it this morning, is that it appears to be attacking the credibility of Agent Davis or the facts that he reported at trial. But, of course, the district court saw Agent Davis testify both at the evidentiary hearing and at trial, expressly found that he was credible. So to the extent we would be reconsidering those facts, we would be on clear error review, which, of course, is a very high standard and one that the record does not support here. For example, one of the supposed contradictions that counsel points out is whether the Border Patrol vehicle had pulled up next to Mr. Haro or if it was just behind. Agent Davis said the material witness was staring straight ahead. Mr. Vera was staring straight ahead. That, in fact, was one of the things he found somewhat suspicious. So it would make sense that he wouldn't at that point look over and see the Border Patrol vehicle. But, again, at the end of the day, the district court already considered these facts, found these facts when finding that there was indeed reasonable suspicion based both on the historical information that led to the Bolo and as it then led to Agent Davis making the observations that he did. And, of course, Agent Davis need not conduct a traffic stop or pull over Mr. Haro the moment he thinks he has reasonable suspicion to the extent he can confirm or dispel whether criminal activity is afoot without pulling him over. It makes sense to do so, and that's exactly what he did here. He testified, he paced him, followed him for approximately five minutes, made these additional observations. Those all led to the belief that there was indeed criminal activity afoot, which is what caused him to pull over Mr. Haro and, in this case, confirm that there was indeed alien smuggling going on as he had suspected. Is there anything in the case law or the statute that would prohibit Agent Davis from taking into account that the vehicle in question was the one in the Bolo and that the person driving the car appeared to match the person described in the Bolo? No, not at all. In fact, he should and, of course, did take that into account because they had that specific information that was in the Bolo that was communicated to him, so he knew what he was looking for and who he was looking for as opposed to just a general, you know, perhaps there is a white car that might be coming by. That would be a little bit different as opposed to Ford Fiesta, this license plate with this general description of the driver. He confirmed all of that matched, made additional observations, and then pulled him over. In terms of, I know Mr. Cortez didn't get a chance to get to it, but just briefly on the recorded deposition and introducing that at trial, the government made more than good faith efforts here to locate the material witness, both at the deposition and once the trial date was set. They provided a letter, provided a subpoena for, at that point, just a pretrial hearing since we did not have a trial date, ensured that he and his attorney both had each other's contact information, received promises from both to stay in contact with each other, said they would pay for travel back to testify. Then, once the trial date was set, which was months later at that point, in August, it was set for September, then immediately the government goes through the material witness' attorney, that attorney says, I no longer have contact with him, and that's when all these other steps start taking place. They place alerts, they search Facebook, requested Mexican government assistance, request an address or updated contact information for his wife from the attorney, and all of that was to no avail. But it was certainly a good faith effort to try to get the material witness back. In terms of the arrests that occurred in April, again, months before even the evidentiary hearing, let alone the trial date being set, those do not count as Brady. They were not exculpatory, they were not suppressed, and there's no reason to believe that they would have resulted in a different outcome, that they were reasonably probable to result in a different outcome. I'm happy to discuss the other issues or answer any questions the court may have. Any other questions by my colleague? No, thank you. All right. I don't think so. Thank you. Very well. So, Mr. Cortes, because you're such a good person, we're going to give you a little extra time. You had one minute and 52 seconds. We are going to increase that to three minutes so that you can regale us with your very best shot. Okay? Thank you very much. Let me pick up where my colleague here from San Diego left off. If you look at the excerpt of record ER63, we included my correspondence, my e-mail correspondence with the assistant U.S. attorney at the time regarding the whereabouts of the material witness. The law is very clear in this area that the government has to make good faith efforts to secure the appearance of a material witness to get that testimony. With respect, Mr. Cortes, other than what it did, and counsel for the government has detailed that, other than what was done, coupled with the fact that you had an opportunity to cross-examine him in the deposition, coupled with the fact that, at least from my perspective, I don't know what would have helped you about his criminal record and, indeed, might have even hurt you, what more could they have done? Let's put you in the government's position. What would you have done? Thank you. Thank you. First, my cross-examination, as I laid out in our brief, my cross-examination of the material witness at the deposition hearing was incomplete. We didn't know what was going to happen in the future. So I didn't have a chance, and that's why later in the beginning of the year, I had the e-mail correspondence, and I beg you to look at it. Look at the correspondence I have with the assistant U.S. attorney. We were thinking of calling the material witness to testify at the suppression hearing. Moreover, there were statements here about the material witness that hinted at him actually telling my client other information other than the government offers. So how could it have helped me in a multitude of ways? Number one, we would probably not waive jury. Number two, we're talking about the government arresting this individual three separate times, not once, three separate times, committing crimes, but he wasn't alone, Judge Smith. This individual was in the company of other migrants, raising the rational inference that he was a smuggler himself. Now, how would that help my client? I can tell you that at the deposition hearing, we would have had a far different cross-examination and that he, in fact, may have told my client that he had documents to be here. So there are a variety of issues that we could have raised. Didn't your client allegedly tell him to say just that? No. It was proven not to be the case? No, that was the government was hoping was the fact. My client did not tell him to say anything because when they were pulled over, and that's when the steering of the wheel happened, the government then asked the material witness, did he do anything? Did he say anything? Look at the transcripts. They're in there. We put them as exhibits. And the government is struggling to get him to admit that my client told him something. And he finally said, well, tell me you have a work permit. But what if the what if the mature witness that told my client precisely that? OK, so with whether we could prove it or not is whether that raised a reasonable doubt and we would have gone to jury trial. So I thank you. You have and we thank you both for your scintillating arguments. We appreciate it very much. The case just argued is submitted and I wish you a good day. Likewise. Thank you very much.
judges: Kelly, SMITH, FORREST